**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**GREENSBORO DIVISION**

MEIRA AVAUNI RAWLINGS, individually, and on behalf of all others similarly situated,

*Plaintiff,*

v.

LANCESOFT, INC.,

*Defendant.*

Case No.: 1:26-cv-461-DAB-JGM

**JURY TRIAL DEMANDED**

## COMPLAINT – CLASS ACTION

## FIRST AMENDED CLASS ACTION COMPLAINT

COMES NOW Plaintiff Meira Avauni Rawlings, individually, and on behalf of all others similarly situated, pursuant to Federal Rule of Civil Procedure 15 and for her First Amended Class Action Complaint against Defendant LanceSoft, Inc., states[1]:

### BACKGROUND, PARTIES, JURISDICTION AND VENUE

1. Plaintiff Meira Avauni Rawlings ("Ms. Rawlings" or "Plaintiff") brings this case to protect the privacy rights of herself and a class of similarly situated people to whom Defendant, LanceSoft, Inc. ("Defendant"), called despite their phone numbers being registered on the National Do-Not-Call Registry ("DNC List") and who continued to receive telephone solicitations after requesting Defendant stop placing such solicitations to them, i.e., to be placed on the Defendant's Internal Do-Not-Call List. Plaintiff brings claims under both the federal Telephone Consumer

[1] This first amended complaint is filed as a matter of right pursuant to Fed. R. Civ. P. 15(a)(1). In addition, Defendant consents to the filing of this First Amended Complaint without waiving any defenses, including those related to the statute of limitations.

Protection Act and the North Carolina Telephone Solicitations Act ("NCTSA"), N.C. Gen. Stat. § 75-100, *et seq.*

2. In the early 1990s, Congress enacted the Telephone Consumer Protection Act ("TCPA") to protect consumers' privacy rights, namely, the right to be left alone from unwanted telemarketing calls. A leading sponsor of the TCPA described unwanted telemarketing calls as "the scourge of modern civilization." 137 Cong. Rec. 30821 (1991).

3. Following the TCPA, North Carolina enacted similar state-level legislation in 2003: the North Carolina Telephone Solicitations Act ("NCTSA"), N.C. Gen. Stat. § 75-100, *et seq.* Like its federal counterpart, the NCTSA prohibits persons and entities from making telephone solicitations to residential or mobile telephone numbers that appear on the National Do-Not-Call Registry and who request to be placed on a company's Internal Do-Not-Call List, and provides a private right of action for injunctive relief, monetary damages, or both. *See* N.C. Gen. Stat. §§ 75-102(a); 75-105(b). The NCTSA's protections encompass both voice calls and text messages. N.C. Gen. Stat. § 75-101(9), (12).

4. The problem with receiving unwanted telemarketing communications is a problem that most people in this country, like Ms. Rawlings, frequently face. For example, in the first seven months of 2026 alone, approximately 28.8 billion robocalls were placed in the United States. RobocallIndex.com, YouMail Robocall Index, https://robocallindex.com/history/time (last visited Aug. 17, 2026).

5. The private right of enforcement of the TCPA is critical to stopping the proliferation of these unwanted telemarketing calls. For example, while the Federal Communications Commission levied over $200 million in penalties against telemarketers between 2015 and 2018, it collected less than $7,000 of that amount. *See* Sarah Krouse, *The FCC Has Fined Robocallers*

*$208 Million. It's Collected $6,790*, THE WALL STREET JOURNAL, March 28, 2019, https://www.wsj.com/articles/the-fcc-has-fined-robocallers-208-million-its-collected-6-790-11553770803.

6. At all times relevant to this Complaint, Ms. Rawlings resided in and has been a citizen of Greensboro, North Carolina.

7. Ms. Rawlings brings this action on behalf of herself, and all others similarly situated.

8. Ms. Rawlings is the owner of a phone. The phone number associated with her phone is 336-XXX-4138.

9. Ms. Rawlings uses her phone for residential purposes, namely, to communicate with family members.

10. Ms. Rawlings's phone account is held in her individual name, and not in the name of a business.

11. Ms. Rawlings is a *person* within the meaning of the TCPA and a *telephone subscriber* within the meaning of the NCTSA. *See* 47 U.S.C. § 153(39); N.C. Gen. Stat. § 75-101(11).

12. To obtain solitude from unwanted telemarketing calls, Ms. Rawlings registered her phone number, 336-XXX-4138, on the DNC List on June 29, 2021.

13. Defendant is a Virginia corporation that has been in good standing to transact business in North Carolina and nationwide at all times material to this Complaint.

14. Defendant transacts business in North Carolina and throughout the United States.

15. Defendant's LinkedIn page states that its services include "temporary and permanent staffing."

16. On information and belief, Defendant makes a profit by staffing persons in positions for its respective clients.

17. This Court has subject matter jurisdiction under 28 U.S.C. § 1331, as this action arises under the TCPA, a federal statute. This Court has supplemental jurisdiction over Plaintiff's NCTSA claim pursuant to 28 U.S.C. § 1367(a), because that claim is so related to Plaintiff's TCPA claim that it forms part of the same case or controversy.

18. This Court has subject matter jurisdiction over this dispute under the Class Action Fairness Act, as the parties are minimally diverse, and the amount in controversy exceeds $5 million. *See* 28 U.S.C. § 1332(d)(2).

19. Venue is proper in this Court as Defendant is a resident of the State in which this District is located, and/or a substantial part of the events giving rise to the claim at issue occurred in this venue.

20. Defendant placed the calls and texts itself and/or directed others acting on its behalf and under its control to do so, such that those communications are attributable to Defendant.

**Defendant Is Paid by Its Clients for Placing the Workers Its Telemarketing Recruits**

21. Defendant is a for-profit staffing agency. Defendant's customers are corporate and government clients who pay Defendant to recruit, screen, and supply workers (referred to by Defendant as "candidates" or "talent") to fill the clients' temporary and permanent staffing needs.

22. Defendant is paid by its clients for the placement of the candidates it recruits. Defendant sells its staffing services through written contracts with its clients, and those contracts provide that Defendant is paid for each hour worked by each candidate Defendant places. In other words, for each hour worked by a candidate, Defendant receives a commission. As such, a candidate is paying for Defendant's services through a reduction in his or her pay.

23. For example, Defendant was an awarded vendor on Commonwealth of Massachusetts Statewide Contract ITS77, "Staff Augmentation" (term July 1, 2021, through June 30, 2026), under which participating government entities post open positions and staffing vendors such as Defendant "recruit candidates and submit resumes" for placement.

24. Under Contract ITS77, the client pays Defendant a "Bill Rate," defined as "the rate the vendor charges" the client, for every hour the placed candidate works. The candidate receives only a lower "Pay Rate," defined as "the direct pay the resource receives." The difference between the two - the "differential" which may run as high as 40% - is Defendant's compensation. Where Defendant is the party that pays the candidate for the work the candidate performs for the client, Defendant's published maximum markup under Contract ITS77 is 14.35% above the candidate's pay rate. In other configurations under the same contract, Defendant charges its client an hourly markup for every hour the candidate works.

25. In plain terms: when Defendant places a candidate, a portion of every dollar the client pays for that candidate's labor is earmarked for and retained by Defendant, for as long as the candidate works. Defendant earns this revenue only if it first recruits a candidate and then places him or her with a paying client. Thus, effectively, Defendant is being paid from a candidate's pay.

26. Similarly, under Detroit Public Schools Community District Contract No. 21-0012-C, titled "Staff Augmentation & Temporary Staffing Services," Defendant's client "will pay for hours of services which have actually been delivered" by Defendant's placed workers, at a rate consisting of the workers' wages plus a fixed markup percentage retained by Defendant. Under that contract, Defendant's markup is 30% to 31% where the "agency finds [the] candidate," but

only 17% to 18% "if [the client] finds the candidate"—and Defendant separately charges an 18% "Direct Placement (recruitment)" fee.

27. Defendant thus earns nearly double the markup when its own recruiting - including its unsolicited telephone calls and text messages - is the source of the candidate. Recruiting consumers by telephone is not a courtesy Defendant extends to the public; it is the revenue-generating core of the staffing services Defendant sells, and Defendant's client contracts price it precisely that way.

28. Defendant's staffing-services revenue is substantial. For example, on September 1, 2021, Defendant bid $13,952,424.48 on a single "[o]pen-end contract for Direct Care Nursing Services" solicited by the State of West Virginia (CRFQ 0613 VNF2200000001).

29. In its written submissions to prospective clients, Defendant markets the very recruiting apparatus at issue in this case: Defendant touts "an average fill rate of 95% of all requisitions received from our clients," a proprietary database "of over 15 Million qualified profiles" of candidates, and recruiting methods that include its "Proprietary Database, Job Boards and Traditional Advertising, Social Media Recruiting, Crowd Sourcing, Evergreen Harvesting, Effective networking, Employee Referral, Headhunting, [and] Patent Recruitment Technology." Defendant's recruiters contact "talent" by telephone as a routine part of this apparatus; indeed, Defendant has boasted of client programs in which it "reduced the amount of time spent communicating with talent via phone by 80 percent"- an admission of how pervasively Defendant uses the telephone to reach the workers it seeks to place.

30. When Defendant places a candidate, the candidate enters a business transaction with Defendant itself: the candidate works for Defendant's client, but it is Defendant that pays the candidate. That is why Defendant's text messages to Ms. Rawlings offered work "on W2."

Defendant, not the client at whose facility the candidate works, is the party that pays the candidate. Defendant bills its client at a marked-up rate for every hour the candidate works, keeps its markup, and remits to the candidate only what remains. Again, the candidate is paying for Defendant's services as the money it could otherwise receive is reduced by the amount Defendant is paid.

31. The economics of Defendant's business model mean that the working candidate, not merely Defendant's client, pays Defendant for Defendant's placement services. The amount a client will pay for a given position is a fixed sum, and Defendant's fee and the candidate's pay both come out of that same fixed sum. Under Contract ITS77, for example, the candidate's pay is calculated by subtracting Defendant's markup from the bill rate - "Pay Rate = Bill Rate / (1 + Markup)" - and the contract user guide makes the tradeoff explicit, advising purchasers that where the bill rate is fixed, "[t]he Resource will have a higher pay rate if they choose the . . . [v]endor with the lowest markup."

32. In other words, every dollar of Defendant's fee is a dollar that the working candidate would otherwise be paid for their labor. A candidate placed by Defendant is paid less for each hour of her work than her work is sold for, precisely because a portion of her earnings is earmarked for, and retained by, Defendant as compensation for Defendant's staffing and placement services. Candidates who accept Defendant's placements thus pay Defendant for its services out of the value of their own work—just as the clients of talent agents, contingency-fee attorneys, and brokers pay for those professionals' services through amounts deducted from the sums those professionals collect on their behalf.

33. Defendant's text messages to Ms. Rawlings illustrate the point. They offered work at a client facility in Whitsett, North Carolina at "$17.50/hr" or "$16/hr" "on W2" - pay rates from which Defendant's margin had already been subtracted. Had Ms. Rawlings accepted, she would

have worked for Defendant's client, been paid by Defendant, and - for every hour she worked - paid Defendant for its placement services through the difference between what the client paid for her labor and what Defendant passed on to her.

34. Accordingly, had Ms. Rawlings, or any recipient of Defendant's calls and text messages, accepted Defendant's solicitations, Defendant would have received payment in connection with the placement from its client, for every hour worked and a portion of the value of the recipient's labor would have been earmarked for Defendant. Defendant's calls and text messages encouraged recipients to enter into business transactions with Defendant, and to use, purchase, and invest their time, labor, and personal information in, Defendant's placement services, from which Defendant profits.

**Defendant's Aggressive Telemarketing**

35. Defendant engages in extensive and harassing telemarketing to market its job placement services.

36. A former employee of Defendant stated about Defendant, "Staffing agency but a proper call center. You need to reach out to unreachable people who don't even pick up the call. . . . Call the US candidates Spam them and then advertise your agency as some certified company!"

37. Ms. Rawlings had never provided prior express written consent, or any form of consent, for Defendant to contact her on her phone.

38. Ms. Rawlings had no established business relationship with Defendant, was never a customer of Defendant, never applied for or inquired about employment or placement with Defendant, and never provided her telephone number to Defendant.

39. On December 26, 2025, at 12:02 p.m., Defendant sent Ms. Rawlings a text message, stating:

> Hello, this is Sonali from LanceSoft. We're hiring for Technical Production & Assembly Tech position in Whitsett, NC and pay is $17.50/hr on W2, Also shared Job description on your email ID. Let me know if you're available or interested. Thanks!
>
> Reply STOP to cancel. Reply HELP for help.

40. On January 14, 2026, at 6:00 p.m., Defendant sent Ms. Rawlings a text message, stating:

> Hi Chris, we have an (sic) 36-month contract opportunity for a Repair Technician, at Whitsett, NC, paying $16/hr on W2. Would you be interested in learning more. (sic)
>
> Reply STOP to cancel. Reply HELP for help.

41. Ms. Rawlings responded to the text message by stating, "STOP."

42. Defendant then responded, "You are unsubscribed to texts from Lancesoft, Inc. No more messages will be sent."

43. Despite Defendant's suggestion to the contrary, Ms. Rawlings never subscribed to receive such text messages from Defendant, nor did she provide Defendant any form of consent to contact her on her phone.

44. On December 19, 2025, at approximately 12:46 p.m., Defendant called Ms. Rawlings's phone. The phone number that appeared on Ms. Rawlings's phone was 571-678-0092. Ms. Rawlings's phone also identified the caller as "LanceSoft, Inc." and that the call originated from a valid phone number.

45. On December 26, 2025, at approximately 12:02 p.m., Defendant called Ms. Rawlings's phone. The phone number that appeared on Ms. Rawlings's phone was 571-678-1629. Ms. Rawlings's phone also identified the caller as "LanceSoft, Inc." and that the call originated from a valid phone number.

46. On January 20, 2026, at approximately 11:34 a.m., Defendant called Ms. Rawlings's phone. The phone number that appeared on Ms. Rawlings's phone was 571-678-0265. Ms. Rawlings's phone also identified the caller as "LanceSoft, Inc." and that the call originated from a valid phone number.

47. On January 21, 2026, at approximately 4:21 p.m., Defendant called Ms. Rawlings's phone. The phone number that appeared on Ms. Rawlings's phone was 571-678-0265. Ms. Rawlings's phone also identified the caller as "LanceSoft, Inc." and that the call originated from a valid phone number.

48. On February 9, 2026, at approximately 2:10 p.m., Defendant called Ms. Rawlings's phone. The phone number that appeared on Ms. Rawlings's phone was 571-678-0683. Ms. Rawlings's phone also identified the caller as "LanceSoft, Inc." and that the call originated from a valid phone number.

49. On February 9, 2026, at approximately 2:10 p.m., Defendant called Ms. Rawlings's phone. The phone number that appeared on Ms. Rawlings's phone was 571-678-0683. Ms. Rawlings's phone also identified the caller as "LanceSoft, Inc." and that the call originated from a valid phone number.

50. On February 9, 2026, at approximately 2:17 p.m., Defendant called Ms. Rawlings's phone. The phone number that appeared on Ms. Rawlings's phone was 571-678-1627. Ms. Rawlings's phone also identified the caller as "LanceSoft, Inc." and that the call originated from a valid phone number.

51. On February 9, 2026, at approximately 2:18 p.m., Defendant called Ms. Rawlings's phone. The phone number that appeared on Ms. Rawlings's phone was 571-678-1627. Ms.

Rawlings's phone also identified the caller as "LanceSoft, Inc." and that the call originated from a valid phone number.

52. On February 9, 2026, at approximately 2:29 p.m., Defendant called Ms. Rawlings's phone. The phone number that appeared on Ms. Rawlings's phone was 571-678-0023. Ms. Rawlings's phone also identified the caller as "LanceSoft, Inc." and that the call originated from a valid phone number.

53. On February 9, 2026, at approximately 2:30 p.m., Defendant called Ms. Rawlings's phone. The phone number that appeared on Ms. Rawlings's phone was 571-678-0023. Ms. Rawlings's phone also identified the caller as "LanceSoft, Inc." and that the call originated from a valid phone number.

54. On February 9, 2026, at approximately 2:33 p.m., Defendant called Ms. Rawlings's phone. The phone number that appeared on Ms. Rawlings's phone was 571-678-0956. Ms. Rawlings's phone also identified the caller as "LanceSoft, Inc." and that the call originated from a valid phone number. Ms. Rawlings told Defendant to stop calling her during this call.

55. Ms. Rawlings believes that Defendant called her at least an additional 50 times in addition to those calls identified in this Complaint.

56. Ms. Rawlings answered some of the calls identified in this suit and those not identified. During those calls the caller would advise they could place her with a job and asked for her resume. Notably, Ms. Rawlings has been a stay-at-home mother for many years and is not looking for employment.

57. The information Defendant sought from Ms. Rawlings is precisely the information Defendant uses to submit candidates to its clients and thereby earn placement fees.

58. Each call and text message was therefore made to further Defendant's own commercial objectives: to acquire candidates whose placement Defendant sells to its paying clients; to encourage recipients to enter into a business transaction with Defendant, work for Defendant's clients while being paid by Defendant, and use and pay for Defendant's placement services; and to market and advertise Defendant's staffing agency and services.

59. To the extent any call or text message also conveyed information about a particular job opening, that information served Defendant's marketing purpose as well. Defendant's ostensibly assistance to candidates is a pretext for, and an integral component of, the commercial staffing services that Defendant sells to its clients for profit, and a means of obtaining the candidate information from which Defendant generates its fees.

60. On information and belief each of the calls and text messages placed to Ms. Rawlings and the putative class members were placed for the purpose of Defendant attempting to solicit Ms. Rawlings and the putative class members to use its services.

61. Despite Plaintiff's "STOP" reply, and despite similar demands by other consumers, Defendant continued to call. Upon information and belief, Defendant failed to institute, maintain, and honor the internal/company-specific do-not-call procedures required by 47 C.F.R. § 64.1200(d) and N.C. Gen. Stat. § 75-102(b)–(d).

62. Other consumers have also made numerous complaints about Defendant's incessant telemarketing practices.

63. One consumer complained, "This Lance Soft company has harassed me since 2024. . . . I am tired of this company calling me and I'm to the point where I'm getting angrier by the day. . . ."

64. Defendant responded to this complaint by stating, " . . . To prevent future communications, we have submitted your information to our IT department to have your information removed from our systems. . . ."

65. Another consumer complained, "I have called them back at least 4 times asking them to put me on their do not call list, but they keep calling me from different phone number[s] with area code 571. I have replied STOP to their text messages at least 10 times and they continue to text me. . . ."

66. Defendant responded to this complaint by stating, " . . . To prevent future communications, we have submitted your information to our IT department to have your information removed from our systems. . . ."

67. Another consumer complained, "I have politely requested to be removed from their contact list. I have made it clear that I am not searching for a job or a contract. I have never filed a request for them to contact me. I have told them if they call again I will file harassment with BBB. That did nothing to stop them contacting me via phone or text. . . . STOP CONTACTING ME PLEASE. . . ."

68. Defendant responded to this complaint by stating, " . . . To prevent future communications, we have submitted your information to our IT department to have your information removed from our systems. . . ."

69. Another consumer complained, " . . . I have repeatedly blocked their numbers only to have them call me from another number or even text me; and if that doesn't work, they email me. I feel like I am being harassed and am getting close to changing my number. I am on the Do Not Call registry which does not seem to matter."

70. Defendant continued calling/texting after Plaintiff and other consumers said "STOP" and asked to be removed; its stock "we've submitted your info to IT to be removed" replies demonstrate knowledge that its recipients wanted no contact and that its conduct, therefore, was knowing and willful, entitling Plaintiff and the class to treble damages under 47 U.S.C. § 227(c)(5) and escalating damages under N.C. Gen. Stat. § 75-105(b).

71. On information and belief, Defendant attempted to call Plaintiff and the putative class members for the purpose of selling its products and services.

72. The calls and text messages described above caused Plaintiff concrete harm. They invaded Plaintiff's privacy and intruded upon her seclusion in her home and on her personal cellular telephone. This is precisely the harm Congress sought to address in enacting the TCPA establishing the National Do-Not-Call Registry and establishing mechanisms for an Internal Do-Not-Call List, and that the North Carolina General Assembly sought to address in enacting the NCTSA. The injury Plaintiff suffered bears a close relationship to the kind of harm traditionally redressed by the common-law tort of intrusion upon seclusion.

73. The calls and text messages were unwanted and nonconsensual. Plaintiff registered her telephone number on the National Do-Not-Call Registry specifically to avoid receiving telemarketing communications of the type Defendant placed, and she asked Defendant to stop contacting her.

74. The calls and text messages caused Plaintiff annoyance, frustration, aggravation, and a sense of being harassed, and forced her to expend time and attention identifying the communications, determining their source, attempting to make them stop, and ultimately seeking legal redress - time and attention that would otherwise have been spent on personal, family, or household matters.

75. The calls and text messages further harmed Plaintiff by occupying her telephone line and the limited storage, battery, and data resources of her cellular device, and by rendering her phone temporarily unavailable to receive legitimate communications. Each unwanted call and text separately and cumulatively contributed to these harms, and Plaintiff and the members of the putative Classes suffered the same or substantially similar concrete injuries because of Defendant's uniform conduct.

## Class Action Allegations

76. Pursuant to Federal Rule of Civil Procedure 23(a), b(2), and b(3), Plaintiff brings this lawsuit as a class action on behalf of herself, and all others similarly situated. This action satisfies the requirements of numerosity, commonality, typicality, and adequacy of representation.

77. Plaintiff seeks to represent the following classes:

> **National DNC Class:** All residential telephone subscribers in the United States who, at any time in the period beginning four years before the filing of this lawsuit through the date of class certification: (1) received more than one telephone solicitation call or text message from or on behalf of Defendant in a twelve-month period; and, (2) whose phone numbers had been registered on the National Do-Not-Call Registry for more than thirty days.

> **North Carolina DNC Class:** All North Carolina telephone subscribers who, at any time in the period beginning four years before the filing of this lawsuit through the date of class certification: (1) received a telephone solicitation call or text message from or on behalf of Defendant; and (2) whose telephone numbers had been registered on the National Do-Not-Call Registry for more than thirty days.

> **National Internal DNC Class**: All persons in the United States who, within four years before the filing of this Complaint through the date of class certification, (1) received more than one telemarketing call from or on behalf of Defendant, (2) within a 12-month period, (3) after having communicated to Defendant a request to receive no further telemarketing calls.

> **North Carolina Internal DNC Class**: All North Carolina telephone subscribers who, within four years before the filing of this Complaint

> through the date of class certification, (1) received a telemarketing call from or on behalf of Defendant, (2) after having communicated to Defendant a request to receive no further telemarketing calls.

78. Plaintiff reserves the right to add administrative subclasses, or to amend the definition of the proposed class, during the lawsuit proceedings.

79. The members of the proposed class are so numerous that joinder of all members is impracticable. Plaintiff reasonably believe that hundreds or thousands of people have been harmed by Defendant's actions. The phone numbers of the members of the proposed class are readily identifiable through records available to Defendant or those acting on its behalf.

80. Most members of the proposed class have suffered damages in an amount such that it would make filing separate lawsuits by individual members economically infeasible.

81. On information and belief, Defendant has called and continues to call people whose phone numbers are on the National Do-Not-Call Registry. It is reasonable to expect that Defendant will continue to place such calls absent this lawsuit.

82. Common questions of law and fact exist as to all members of the proposed class and predominate over any questions affecting only individual members. The questions of law and fact common to the proposed class include, but are not limited to:

a. Whether Defendant placed phone calls to persons whose phone numbers were listed on the National Do-Not-Call Registry;

b. Whether Defendant's conduct violates 47 U.S.C. § 227(c);

c. Whether Defendant's conduct violates N.C. Gen. Stat. § 75-102(a);

d. Whether Defendant's conduct violates the rules and regulations implementing the TCPA;

e. Whether Plaintiff and the putative class members are entitled to increased damages for each violation based on the willfulness of Defendant's conduct;

f. Whether Defendant established and implemented written procedures for maintaining an internal do-not-call list, and honored consumer do-not-call requests, as required by 47 C.F.R. § 64.1200(d) and N.C. Gen. Stat. § 75-102(b)-(d); and,

g. Whether Defendant continued to place telemarketing calls and text messages to persons after they communicated a request that Defendant stop contacting them.

83. Plaintiff's claims are typical of the claims of the proposed class members because her claims arise from the same practice that gives rise to the claims of the members of the proposed class and are based on the same legal theories.

84. Plaintiff and her counsel will fairly and adequately protect the interests of the members of the proposed class. Plaintiff's interests do not conflict with the interests of the proposed class she seeks to represent. Plaintiff has retained lawyers who are competent and experienced in class action litigation, TCPA litigation and consumer law.

85. Plaintiff's counsel will vigorously litigate this case as a class action, and Plaintiff and her counsel are aware of their responsibilities to the putative members of the class and will discharge those duties.

86. A class action is superior to all individual lawsuits for this controversy. Joinder of all proposed members of the proposed class in one action is impracticable if not impossible and prosecuting hundreds or thousands of individual actions is not feasible. The size of the individual claims is likely not large enough to justify filing a separate action for each claim. For many, if not most, members of the proposed class, a class action is the only procedural mechanism that will allow recovery. Even if members of the proposed class had the resources to pursue individual litigation, that method would be unduly burdensome to the courts. Individual litigation could also result in inconsistent adjudications.

87. In contrast, a class action is superior in that it will benefit the court and litigating parties through efficiency, economy of scale and unitary adjudication resulting from supervision of the litigation by a single court.

88. Questions of law and fact, particularly the propriety of placing telemarketing phone calls to persons whose phone numbers are on the National Do-Not-Call Registry, predominate over questions affecting only individual members.

89. Defendant has acted or refused to act on grounds that apply generally to the class, making final injunctive relief or corresponding declaratory relief is appropriate with respect to the class as a whole.

**Count I - Violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(c) – National Do-Not-Call Registry Violations.**

90. Plaintiff incorporates by reference the allegations of the previous paragraphs as if fully stated in this Count.

91. The TCPA provides that "a person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection" may recover $500 for each violation, and up to $1,500 for each violation, if the violation is determined to be willful. *See* 47 U.S.C. §§ 227(c)(5).

92. The TCPA provides that it is a violation of the law for a person whose phone number is registered on the National Do Not Call Registry to receive more than one call on their phone "within any 12-month period by or on behalf of the same entity." *See* 47 U.S.C. §§ 227(c)(1), (c)(5); 47 C.F.R. § 64.1200(c)(2).

93. Each call and text message Defendant placed to Plaintiff and the putative class members was initiated for the purpose of encouraging the purchase of, or investment in, Defendant's staffing and placement services within the meaning of 47 U.S.C. § 227(a)(4) and 47

C.F.R. § 64.1200(f)(15) and therefore constituted a "telephone solicitation." Defendant is paid by its clients for placing the candidates its telemarketing recruits; Defendant retains a portion of the value of each placed candidate's labor, including through markups on hourly bill rates that are borne by the candidates themselves, who are paid less for each hour of their work than Defendant bills for that work; Defendant earns a higher markup when its own recruiting sources the candidate; and had Plaintiff or any putative class member accepted placement, Defendant would have been paid both by its client and out of the placed candidate's own earnings. Defendant's calls and text messages were also made as a pretext to promote, market, and advertise Defendant's staffing agency and its services, and to obtain information - including resumes and availability- that will or may be used for those commercial purposes.

94. In addition, the TCPA allows the Court to enjoin Defendant's violations of the TCPA and the TCPA's regulations prohibiting calls to phone numbers that are registered on the National Do-Not-Call Registry. *See* 47 U.S.C. §§ 227(c)(5)(A).

95. By placing phone calls to the phones of Plaintiff and the putative class members after their numbers were registered on the National Do-Not-Call Registry, Defendant violated the TCPA, including, but not limited to, 47 U.S.C. § 227(c) and the TCPA's corresponding regulations.

96. Defendant knew or should have known that Plaintiff and the putative class members did not wish to receive phone calls as such persons' phone numbers were registered on the National Do-Not-Call Registry.

97. Plaintiff and the putative class members are entitled to damages of $500.00 per violation for each call placed to them in violation of the TCPA and up to $1,500.00 per violation if the Court finds that Defendant willfully violated the TCPA.

## Count II – Violations of the TCPA
## 47 U.S.C. § 227(c) / 47 C.F.R. § 64.1200(d) – Internal Do-Not-Call List Violations

98. Plaintiff incorporates by reference the allegations of the previous paragraphs as if fully stated in this Count.

99. Defendant placed more than one telephone solicitation to Plaintiff within a 12-month period without maintaining or honoring the internal do-not-call procedures the TCPA requires, and after Plaintiff asked it to stop.

100. The TCPA and its implementing regulations require any person or entity initiating telephone solicitations to establish and implement written procedures to maintain a list of persons who have requested not to receive telemarketing calls from that person or entity (an "internal do-not-call list"), and to honor such requests. 47 C.F.R. § 64.1200(d).

101. Specifically, 47 C.F.R. § 64.1200(d) requires, among other things, that a person or entity initiating telephone solicitations: (a) maintain a written policy, available upon demand, for maintaining an internal do-not-call list; (b) train personnel engaged in telemarketing on the existence and use of the internal do-not-call list; (c) record and honor a consumer's do-not-call request at the time the request is made; (d) honor such requests within a reasonable time, not to exceed 30 days from the date of the request; and (e) maintain a record of the request for at least five years.

102. A person or entity that initiates a telephone solicitation without having established and implemented these procedures, or that fails to honor a consumer's do-not-call request, violates § 64.1200(d) and the TCPA.

103. Defendant, and/or its affiliates, agents, and other persons or entities acting on Defendant's behalf, violated 47 C.F.R. § 64.1200(d) and the TCPA by, among other things: (a) failing to establish and implement reasonable written procedures to honor consumer do-not-call

requests; (b) failing to train their personnel on the existence and use of an internal do-not-call list; (c) failing to honor Plaintiff's do-not-call requests; and (d) initiating telephone solicitations to Plaintiff and members of the National Internal DNC Class after each of them had communicated to Defendant a request to receive no further telemarketing calls.

104. The continued calls Defendant placed to Plaintiff after Plaintiff's express request that they cease, demonstrate Defendant's failure to establish and implement the procedures required by 47 C.F.R. § 64.1200(d).

105. These violations were willful or knowing.

106. As a result of Defendant's violations of 47 C.F.R. § 64.1200(d) and the TCPA, and/or such violations by Defendant's affiliates, agents, and other persons or entities acting on Defendant's behalf, Plaintiff and members of the National Internal DNC Class are each entitled to statutory damages of $500.00 per violation, which the Court may treble to up to $1,500.00 per violation for willful or knowing violations, pursuant to 47 U.S.C. § 227(c)(5).

**Count III – Violations of the North Carolina Telephone Solicitations Act ("NCTSA"), N.C. Gen. Stat. § 75-102(a) – Do-Not-Call Registry Violations.**

107. Plaintiff incorporates by reference the allegations of the previous paragraphs as if fully stated in this Count.

108. Defendant LanceSoft, Inc. is a *telephone solicitor* under the NCTSA. *See* N.C. Gen. Stat. § 75-101(10).

109. Plaintiff is a *telephone subscriber* under the NCTSA. *See* N.C. Gen. Stat. § 75-101(11).

110. Each call (including text messages) made by Defendant to Plaintiff and the members of the NCTSA DNC Class is a *telephone solicitation* as defined by the NCTSA. *See* N.C. Gen. Stat. § 75-101(9), (12).

111. Each such call and text message was made for the purpose of soliciting and encouraging the purchase of, or investment in, Defendant's staffing and placement services. Candidates who accept Defendant's placements purchase and pay for those services through the portion of their hourly earnings that Defendant retains. In addition, each such call and text message was made for the purpose of "obtaining or providing information that will or may be used for" such purpose within the meaning of N.C. Gen. Stat. § 75-101(9), including without limitation Defendant's requests for Ms. Rawlings's resume and her availability - information Defendant obtains in order to submit candidates for fee-generating placements with its paying clients.

112. It is a violation of the NCTSA to initiate any telephone solicitation to a North Carolina telephone subscriber whose telephone number is registered on the National Do-Not-Call Registry. N.C. Gen. Stat. § 75-102(a).

113. Defendant, and/or its affiliates, agents, and/or other persons or entities acting on Defendant's behalf, violated the NCTSA by causing telephone solicitations to be delivered to Plaintiff and the members of the NCTSA DNC Class, despite each member's registration of his or her telephone number on the National Do-Not-Call Registry.

114. As a result of Defendant's violations of the NCTSA, N.C. Gen. Stat. § 75-100 *et seq.*, and/or such violations by affiliates, agents, and/or other persons or entities acting on Defendant's behalf, Plaintiff and the members of the NCTSA DNC Class are entitled to and do seek an award of $500 in damages for the first violation, $1,000 for the second violation, and $5,000 for the third and subsequent violation, in addition to injunctive relief and attorneys' fees and costs, pursuant to N.C. Gen. Stat. § 75-105(b)(1), (b)(2), and (d).

## Count IV – Violations of the NCTSA
## N.C. Gen. Stat. § 75-102(b) - Internal Do-Not-Call List Violations

115. Plaintiff incorporates by reference the allegations of the previous paragraphs as if fully stated in this Count.

116. Defendant is a telephone solicitor under the NCTSA. See N.C. Gen. Stat. § 75-101(10).

117. Plaintiff is a telephone subscriber under the NCTSA. See N.C. Gen. Stat. § 75-101(11).

118. The NCTSA prohibits a telephone solicitor from making "a telephone solicitation to a telephone subscriber's telephone number [after] the telephone subscriber previously has communicated to the telephone solicitor a desire to receive no further telephone solicitations from the telephone solicitor to that telephone number." N.C. Gen. Stat. § 75-102(b).

119. Plaintiff communicated to Defendant her desire to receive no further telephone solicitations from Defendant to her telephone number.

120. Despite Plaintiff's request, Defendant, and/or its affiliates, agents, and other persons or entities acting on its behalf, continued to place telephone solicitations to Plaintiff in violation of N.C. Gen. Stat. § 75-102(b).

121. Defendant, and/or its affiliates, agents, and other persons or entities acting on their behalf, likewise violated N.C. Gen. Stat. § 75-102(b) by placing telephone solicitations to members of the North Carolina Internal DNC Class after each member had communicated to Defendant a desire to receive no further telephone solicitations.

122. As a result of Defendant's violations of N.C. Gen. Stat. § 75-102(b), and/or such violations by affiliates, agents, and other persons or entities acting on Defendant's behalf, Plaintiff and members of the North Carolina Internal DNC Class are entitled to and do seek an award of

$500 in damages for the first violation, $1,000 for the second violation, and $5,000 for the third and subsequent violations, in addition to injunctive relief and attorneys' fees and costs, pursuant to N.C. Gen. Stat. § 75-105(b)(1), (b)(2), and (d).

**Demand for Judgment**

WHEREFORE Plaintiff Meira Avauni Rawlings, individually, and on behalf of all others similarly situated, requests the Court grant the following relief:

a. Enter an order against Defendant LanceSoft, Inc. pursuant to Federal Rule of Civil Procedure 23, certifying this action as a class action and appointing Plaintiff as the class representative;

b. Enter an order appointing Plaintiff's counsel as counsel for the class;

c. Enter judgment in favor of Plaintiff and the putative National DNC Class and the National Internal DNC class for all damages available under the TCPA, including statutory damages of $500 per violation of the TCPA, or up to $1,500 per violation of the TCPA if Defendant willfully violated the TCPA;

d. Enter judgment in favor of Plaintiff and the North Carolina DNC Class and the North Carolina Internal DNC Class for all damages available under the NCTSA, including statutory damages of $500 for the first violation, $1,000 for the second violation, and $5,000 for the third and subsequent violation, pursuant to N.C. Gen. Stat. § 75-105(b)(1) and (b)(2);

e. Enter a judgment in favor of Plaintiff, the National DNC Class, and the National Internal DNC Class that enjoins Defendant from placing telephone solicitations to persons whose telephone numbers are registered on the National Do-Not-Call Registry and to any person who has communicated to Defendant a request to receive no further telemarketing calls, in violation of the TCPA and its implementing regulations;

f. Enter a judgment in favor of Plaintiff, the NCTSA DNC Class, and the North Carolina Internal DNC Class that enjoins Defendant, pursuant to N.C. Gen. Stat. § 75-105(b)(1), from making telephone solicitations to any North Carolina telephone subscriber whose telephone number is registered on the National Do-Not-Call Registry or who has communicated a desire to receive no further telephone solicitations;

g. Award Plaintiff and the NCTSA DNC Class their reasonable attorneys' fees and costs pursuant to N.C. Gen. Stat. § 75-105(d);

h. Award Plaintiff and the class all expenses of this action, and require that Defendant pay the costs and expenses of class notice and administration;

i. Award Plaintiff and the class their court costs, and all applicable pre- and post-judgment interest; and,

j. Award Plaintiff and the class such further and other relief the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Please take notice that Plaintiff demands a jury trial in this case.

This the 18th day of August 2026.

Respectfully submitted,

BY: /s/ *Karl S. Gwaltney*
Karl S. Gwaltney
Maginnis Howard
N.C. State Bar No. 45118
7706 Six Forks Road, Suite 101
Raleigh, NC 27615
Telephone: 919-526-0450
Fax: 919-882-8763
kgwaltney@carolinalaw.com

Local Civil Rule 83.1(d) Counsel for Plaintiff

*/s/ Christopher E. Roberts*
Christopher E. Roberts (special appearance)
Missouri State Bar No. 61895
BUTSCH ROBERTS & ASSOCIATES LLC
7777 Bonhomme Avenue, Suite 1300
Clayton, Missouri 63105
Telephone: (314) 863-5700
E-mail: croberts@butschroberts.com

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing First Amended Class Action Complaint has been electronically filed with the Clerk of Court by using the CM/ECF system, which will send notice of the filing to all parties of record.

Dated this 19th day of August, 2026.

*/s/ Christopher E. Roberts*
Christopher E. Roberts

*Counsel for Plaintiff*