**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**GREENSBORO DIVISION**

| | | |
|---|---|---|
| MEIRA AVAUNI RAWLINGS, *individually, and on behalf of all others similarly situated,* | ) | CIVIL ACTION NO.: |
| | ) | 1:26-CV-00461-DAB-JGM |
| Plaintiff, | ) | |
| v. | ) | |
| LANCESOFT, INC., | ) | |
| Defendant. | ) | |

---

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT AND TO STRIKE CLASS ALLEGATIONS**

## I. INTRODUCTION

A real-estate agent who cold-calls a homeowner does not ask the homeowner to pay a fee. The agent's fee comes out of the sale of the house. A talent agent who cold-calls a rising star does not ask for a check. The agent's fee comes out of the star's earnings. A lawyer who takes a case on a contingency does not ask the client for a fee. The fee comes out of the client's recovery. No one doubts that a call placed to land any of those engagements is a solicitation. Defendant LanceSoft, Inc.'s ("Defendant" or "LanceSoft") calls to Plaintiff Meira Rawlings ("Plaintiff") were no different.

LanceSoft's text messages offered "$17.50/hr on W2" and "$16/hr on W2." (Doc. 16 ("Complaint"), ¶¶ 39-40). That figure was not a wage LanceSoft's client was offering her. Rather, as the Complaint alleges, it was what would have remained after LanceSoft

took its cut from Plaintiff's pay. *See id.* at ¶¶ 22, 25, 31-34. LanceSoft later called Plaintiff at least eleven times to solicit Plaintiff to work so that LanceSoft could profit. *Id.* at ¶¶ 44-55.[1]

LanceSoft's contracts speak to how, like the cold-calling real estate agent or talent agent, it takes pay out of the worker's check. Under LanceSoft's contracts, the client pays LanceSoft a "Bill Rate," the worker receives a lower "Pay Rate," and the formula that connects them, "Pay Rate = Bill Rate / (1 + Markup)," starts from the client's dollar and subtracts LanceSoft's fee before the worker sees any of it. *See id.* at ¶¶ 24, 31. LanceSoft would have paid Plaintiff out of that which it billed for her labor and kept the rest for as long as she worked. *Id.* at ¶¶ 30-34.

LanceSoft's pitch was not merely "a job is available and we are simply letting you know about it." The pitch was "let us place you with our client, and we will keep part of what the client pays for your work." A call made to sell that arrangement to the person who decides whether to accept it is a telephone solicitation. LanceSoft made more than a dozen such communications to Plaintiff, a stay-at-home mother who was not looking for work and whose number has been on the National Do-Not-Call Registry ("DNC List") since 2021. *Id.* at ¶¶ 8-9, 12, 40-56.

[1] Plaintiff advises the Court that she abandons her claims under the TCPA concerning the **text messages** she received from LanceSoft. The text messages she received, however, remain relevant to the case for two reasons: (1) they provide context for the reason why LanceSoft placed a litany of calls to Plaintiff's phone; and (2) the text messages remain actionable under Plaintiff's state law claims.

## II. FACTUAL ALLEGATIONS

### A. LanceSoft's business model.

LanceSoft is a for-profit staffing agency whose corporate and government clients pay it to recruit, screen, and supply workers whom LanceSoft refers to as "candidates." (*See* Complaint, ¶¶ 14-16, 21). Its client contracts pay LanceSoft for every hour a placed candidate works. *Id.* at ¶ 22. As such, a candidate pays for Defendant's services through a reduction in his or her pay. *Id.*

The contracts between LanceSoft and its clients speak to this arrangement. For example, under Massachusetts Statewide Contract ITS77, the client pays a "Bill Rate"; the candidate receives only a lower "Pay Rate"; and the difference is LanceSoft's compensation. *Id.* at ¶¶ 23-24. The contract computes the candidate's pay by subtracting LanceSoft's markup out of the bill rate. *Id.* at ¶ 31. That formula is "Pay Rate = Bill Rate / (1 + Markup)." *Id.* Moreover, the contract user guide tells purchasers that where the bill rate is fixed, "[t]he Resource will have a higher pay rate if they choose the . . . [v]endor with the lowest markup." *Id*. Similarly, LanceSoft's markup is 30% to 31% under a Detroit Public Schools contract where the "agency finds [the] candidate," but only 17% to 18% "if [the client] finds the candidate." *Id.* at ¶ 26. LanceSoft thus earns nearly double when its own recruiting, including its telephone calls, is the source of the candidate. *Id.* at ¶ 27.

As LanceSoft, not the client, pays the placed candidate (hence its offers of work "on W2"), LanceSoft bills its client at the marked-up rate, "keeps its markup, and remits to the candidate only what remains." *Id.* at ¶ 30. As such, "every dollar of Defendant's fee is a dollar that the working candidate would otherwise be paid," and candidates "pay Defendant

for its services out of the value of their own work - just as the clients of talent agents, contingency-fee attorneys, and brokers pay for those professionals' services through amounts deducted from the sums those professionals collect on their behalf." *Id.* at ¶ 32. Had Plaintiff accepted LanceSoft's placement, she would have "paid Defendant for its placement services through the difference between what the client paid for her labor and what Defendant passed on to her." *Id.* at ¶ 33.

**B. LanceSoft uses telephone solicitations to advance its business model.**

Telephone recruiting is central to its business model. In its submissions to prospective clients, LanceSoft touts "an average fill rate of 95% of all requisitions received from our clients," a proprietary database "of over 15 million qualified profiles," and recruiting methods that include "Headhunting." *Id.* at ¶ 29. Indeed, LanceSoft has boasted of client programs in which it "reduced the amount of time spent communicating with talent via phone by 80 percent." *Id.* at ¶ 29.

This litany of calls is critical to LanceSoft because the revenue at stake is substantial. For example, LanceSoft bid nearly $14 million on a single West Virginia nursing contract. *Id.* at ¶ 28. Indeed, "[r]ecruiting consumers by telephone is not a courtesy Defendant extends to the public; it is the revenue-generating core of the staffing services Defendant sells," and LanceSoft's "client contracts price it precisely that way." *Id.* at ¶ 27.

**C. LanceSoft places a litany of telephone solicitations to Plaintiff's phone.**

LanceSoft directed its telephone solicitation model to Plaintiff's phone despite not having permission to do so. *See id.* at ¶¶ 1, 35-56. LanceSoft did so even though Plaintiff's phone number has been registered on the DNC List since June 29, 2021. *See id.* at ¶¶ 8-12.

Moreover, LanceSoft did not have consent of any kind to contact Plaintiff, had no relationship with Plaintiff, and Plaintiff never applied to LanceSoft, nor did she provide LanceSoft her number. *Id.* at ¶¶ 37-38. Notably, Plaintiff has been a stay-at-home mother for many years and is not looking for employment. *Id.* at ¶ 56.

Beginning December 19, 2025, LanceSoft called Plaintiff repeatedly from a rotating series of "571" numbers, each identified on her phone as "LanceSoft, Inc." *Id.* at ¶¶ 44-54. On February 9, 2026, alone, LanceSoft called seven times between 2:10 and 2:33 p.m. *Id.* at ¶¶ 48-54. On the last of those calls Plaintiff again told LanceSoft to stop calling. *Id.* at ¶ 54. Plaintiff believes LanceSoft called at least fifty additional times. *Id.* at ¶ 55. When Plaintiff answered many of these calls, "the caller would advise they could place her with a job and asked for her resume" which is "precisely the information Defendant uses to submit candidates to its clients and thereby earn placement fees." *Id.* at ¶¶ 56-57.

LanceSoft also sent Plaintiff two text messages offering work at a client's facility. *Id.* at ¶¶ 39-40. Plaintiff replied "STOP," and LanceSoft answered that she was "unsubscribed." *Id.* at ¶¶ 41-42. LanceSoft then called her at least nine more times. *See id.* at ¶¶ 46-54.

Ultimately, these communications improperly invaded Plaintiff's privacy, intruded on her seclusion in her home, occupied her telephone line, consumed her time and attention, and were annoying, frustrating and aggravating. *Id.* at ¶¶ 72-75.

### D. LanceSoft's aggressive telephone solicitation practices were not unique to Plaintiff.

LanceSoft is well-known for its aggressive telemarketing tactics. A former LanceSoft employee described the company as a "[s]taffing agency but a proper call center" whose practice is to "[c]all the US candidates Spam them and then advertise your agency as some certified company!" *Id.* at ¶ 36. Consistent with that description, one consumer "called them back at least 4 times asking them to put me on their do not call list, but they keep calling me from different phone number[s] with area code 571. I have replied STOP to their text messages at least 10 times and they continue to text me." *Id.* at ¶ 65. Another consumer complained, "I am on the Do Not Call registry which does not seem to matter." *Id.* at ¶ 69. To each complaint LanceSoft gave the same stock reply - that it had "submitted your information to our IT department to have your information removed from our systems." *Id.* at ¶¶ 64, 66, 68. These replies demonstrate LanceSoft's knowledge that its recipients wanted no contact, and that its conduct was knowing and willful. *Id.* at ¶ 70.

Ultimately, each call made by LanceSoft was made "to encourage recipients to enter into a business transaction with Defendant, work for Defendant's clients while being paid by Defendant, and use and pay for Defendant's placement services" and to "market and advertise Defendant's staffing agency and services." *Id.* at ¶ 58. These communications were also placed to obtain the candidate information "from which Defendant generates its fees." *Id.* at ¶ 59.

Plaintiff brings four counts individually and on behalf of various classes: TCPA National Do-Not-Call (Count I) and internal Do-Not-Call (Count II) claims, and parallel

claims under the North Carolina Telephone Solicitations Act ("NCTSA"), N.C. Gen. Stat. § 75-102(a) and (b) (Counts III and IV). *Id.* at ¶¶ 90-122. Defendant's motion follows.

## III. <u>LEGAL STANDARDS</u>

A Rule 12(b)(6) motion tests the legal sufficiency of the complaint, not the merits. *See generally Smith v. Campbell's Co.*, 2026 WL 1805816, at *2 (M.D.N.C. Apr. 21, 2026) (Bragdon, J.). At this stage, the Court must "accept as true all well-pleaded allegations and view the complaint in the light most favorable to the plaintiff . . . ." *Id.* (quoting *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)). A claim is plausibly stated where a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. At this stage the Court does not weigh competing inferences, resolve factual disputes, or decide which version of events is more likely; but simply determines whether the complaint "nudge[s]" the claim "across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Rule 12(f) motions to strike class allegations are "infrequently" granted. *Schwab v. Rsch. Triangle Inst.*, 2026 WL 673105, at *6 (M.D.N.C. Mar. 10, 2026) (internal citation and quotation omitted). Rather, it is only appropriate to strike class allegations where the "face of" the complaint establishes it "will be impossible to certify the classes alleged by the plaintiffs regardless of the facts the plaintiffs may be able to prove." *Id.* (internal citation and quotation omitted).

## IV. ARGUMENT

### A. Defendant's motion to dismiss should be denied because Plaintiff sufficiently alleges LanceSoft's communications are "telephone solicitations."

#### 1. Whether a call is a "telephone solicitation" turns on the caller's purpose, which the Complaint directly alleges.

The TCPA's do-not-call provisions prohibit "initiat[ing] any telephone solicitation" to a residential subscriber whose number is on the DNC List. 47 C.F.R. § 64.1200(c)(2); 47 U.S.C. § 227(c)(5); *see also Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 649 (4th Cir. 2019). A "telephone solicitation" is "the initiation of a telephone call or message **for the purpose of** encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 U.S.C. § 227(a)(4) (emphasis added); 47 C.F.R. § 64.1200(f)(15). "Telemarketing," the operative term for the internal do-not-call rules underlying Count II, is defined identically. 47 C.F.R. § 64.1200(f)(13). Consistent with the plain language of the statute, the FCC recognizes that a "telephone solicitation" is not based on the "caller's characterization of the call, but on the purpose of the message." *In re Rules and Regulations Implementing the Tel. Consumer Protection Act of 1991*, 18 F.C.C.R. 14014, 14098 (July 3, 2003). The dispositive question as to whether a communication is a "telephone solicitation" is therefore the caller's purpose.

North Carolina courts consider the caller's purpose by evaluating the "content and context of the message while using a measure of common sense." *Davis v. Reliance First Cap., LLC*, 2023 WL 1982354, at *4 (E.D.N.C. Feb. 13, 2023) (internal quotation omitted and citing *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012)). A

"solicitation" exists where the communication is "meant to elicit a business transaction between the recipient and [the defendant]." *Id.*

The Ninth Circuit recently explained why this is the standard in *Coffey v. Fast Easy Offer, LLC*, 178 F.4th 480 (9th Cir. 2026). In *Coffey*, a lead-generation company sent a consumer on the Do-Not-Call registry texts and calls that, on their face, said nothing about buying anything - asking only, "Have you given up on selling your . . . property?" *Id.* at 482. The district court dismissed, holding, as LanceSoft argues here, that the communications "were not telephone solicitations . . . because they did not expressly encourage the purchases of services." *Id.* The Ninth Circuit reversed. Construing the identical statutory definition at issue here, the court held that the "'purpose' at issue is not, on a plain read, the purpose of the call or message, but instead of the 'initiation' of that call or message." *Id.* at 483. A content-only reading "would render 'the initiation of' superfluous." *Id.* The *Coffey* court therefore held that courts "must consider not only the content of the messages . . . but also their context as it illuminates [the sender's] purpose in initiating the messages, when determining whether they qualify as telephone solicitations." *Id.* Because the plaintiff alleged that one purpose of initiating the messages was to solicit the purchase of real estate brokerage services - even though the texts never said so - she stated a claim. *Id.* at 483-84.

This case is like *Coffey*. LanceSoft's texts and calls were framed as job openings, but Plaintiff alleges that LanceSoft initiated them for the purpose of soliciting her "to use its services" and "selling its products and services." (*See* Complaint, ¶¶ 21-34, 53, 60, 71). Just as the lead-generation company in *Coffey* funneled recipients into its brokerage

services, LanceSoft's recruiting is the very means by which it markets and sells its staffing services. Under *Coffey*, the Court must look to the alleged purpose behind LanceSoft's outreach, not merely the words of any single text. Plaintiff squarely pleads that purpose.

Defendant, however, erroneously contends that because its communications do not "ask[] Plaintiff to purchase, rent, or invest in LanceSoft's staffing services, pay a fee, or buy anything," that the inquiry is over. (Doc. 17, p. 8). Yet, "[n]either the statute nor the regulations require an explicit mention of a good, product, or service where the implication is clear from the context." *Chesbro*, 705 F.3d at 918. The context is clear - LanceSoft was not placing these calls out of the goodness of its heart - it was placing these to solicit business.

**a. The plain language of the definition of "telephone solicitation" in Section 227(a)(4) supports Plaintiff's position.**

Three features of Section 227(a)(4)'s text also defeat LanceSoft's motion. First, the statute regulates the **<u>initiation</u>** of a call "for the purpose of" encouraging a purchase. 47 U.S.C. § 227(a)(4) (emphasis added). The question is why the caller picked up the phone, not whether the words it used contained a sales pitch. LanceSoft's motion looks only at the words of its messages; the statute looks at LanceSoft's purpose, which the Complaint alleges in detail. (Complaint, ¶¶ 21-34, 57-60).

Second, the object of "encouraging" is "the purchase . . . of . . . services," stated in the passive voice and without naming a purchaser. 47 U.S.C. § 227(a)(4). Congress knew how to refer to the person on the other end of the line. Indeed, Section 227 "refers to the 'called party' eight times and refers to the call's 'recipient' eleven times." *Hulce v. Zipongo*

*Inc.*, 132 F.4th 493, 501 (7th Cir. 2025) (Brennan, J., dissenting). It did not do so in Section 227(a)(4). *Id.* As Judge Brennan noted:

> Once the statute's passive voice is put in context, dictionary definitions of 'encourage' are not at odds with [plaintiff's] reading of the statute. For instance, the district court defined 'encourage' as 'to attempt to persuade: urge.' . . . But this [reading] assumes the urging must be of a person, rather than of a purchase.

*Id.* at 502.

As such, a worker who accepts a placement at a pay rate from which LanceSoft's markup has already been subtracted pays for that placement with the equivalent of money - the portion of her wages that LanceSoft keeps. (Complaint, ¶¶ 24-25, 30-34). Even under the narrower reading of the *Hulce* majority, which requires that the person encouraged also be the person who pays, the statute is satisfied, because the Complaint alleges that the candidate pays. *See* Section IV.A.2, *infra*.

Third, when Congress wanted to exclude categories of calls from the definition, it said so. Section 227(a)(4) expressly carves out calls made with the recipient's "prior express invitation or permission," calls to persons with whom the caller has "an established business relationship," and calls "by or on behalf of a tax-exempt nonprofit organization." 47 U.S.C. § 227(a)(4)(A)-(C). There is no exception for employment recruiting, staffing agencies, or calls offering an "opportunity to earn money." LanceSoft's categorical rule that a recruiting call is never a telephone solicitation is simply an exception Congress did not enact.

### 2. The cases on which Defendant relies are readily distinguishable and/or support denying Defendant's motion.

LanceSoft first relies on the readily distinguishable case of *Rockwell v. Medicus Healthcare Sols.*, *LLC*, 2025 WL 959745 (W.D.N.Y. Mar. 31, 2025). (Doc. 17, pp. 7-8). *Rockwell*, however, does not hold that employment-related communications can never be telephone solicitations; it describes when they are. While the *Rockwell* court held that the communications at issue were not telephone solicitations, it noted:

> **It is possible that an individual client like Rockwell would pay a fee if he accepted Medicus's placement for professional services or have a portion of his eventual income earmarked to cover those services.** . . . In the absence of any allegations about the workings of Medicus's business model and the role that its professional services play in that business model, this Court cannot conclude that the telephone calls Rockwell received constituted 'telemarketing' or 'telephone solicitation' under the TCPA and its implementing regulations.

*Rockwell*, 2025 WL 959745 at *5 (emphasis added). The *Rockwell* court drew the very distinction LanceSoft resists: where the opportunity is "not with [the caller] but rather *through* [the caller], and presumably by which [the caller] would earn commissions or fees," the calls are "made to further [the agency's] own objectives," and "services that appear to be free or to offer recruitment opportunities may 'serve as a mere pretext for commercial services.'" *Id.* at *4 (emphasis added and citation omitted).

Plaintiff alleges precisely what the *Rockwell* court noted was missing. Unlike the Plaintiff in *Rockwell*, Plaintiff repeatedly and expressly alleges that a portion of her income would be used to pay for LanceSoft's services. (*See* Complaint, ¶¶ 22-34). These allegations are not conclusory but are based on the terms of LanceSoft's own contracts and

communications. *Id.* at ¶¶ 24, 26, 31. With these facts as a foundation, Plaintiff expressly alleges:

- "In plain terms: when Defendant places a candidate, a portion of every dollar the client pays for that candidate's labor is earmarked for and retained by Defendant for as long as the candidate works. . . . Thus, effectively, Defendant is being paid from a candidate's pay."

- "[A] candidate is paying for Defendant's services through a reduction in his or her pay."

- "The economics of Defendant's business model mean that the working candidate, not merely Defendant's client, pays Defendant for Defendant's placement services."

- "In other words, every dollar of Defendant's fee is a dollar that the working candidate would otherwise be paid for their labor."

- "Candidates who accept Defendant's placements thus pay Defendant for its services out of the value of their own work . . . ."

- "Had Ms. Rawlings accepted, she would have . . . for every hour she worked - paid Defendant for its placement services through the difference between what the client paid for her labor and what Defendant passed on to her."

- "Defendant's calls and text messages encouraged recipients to enter into business transactions with Defendant, and to use, purchase, and invest their time, labor, and personal information in, Defendant's placement services, from which Defendant profits."

*Id.* at ¶¶ 22, 25, 31-34. In short, Plaintiff's allegations follow the guide set forth in *Rockwell* as to when such communications are "telephone solicitations."

The Northern District of California reached that result on allegations like these. *See Risher v. Adecco Inc.*, 2020 WL 13505422 (N.D. Cal. Feb. 14, 2020). In *Risher*, a staffing agency "which operates a job placement service" texted the plaintiff "soliciting him for possible employment through Adecco," then moved to dismiss his do-not-call claim on the

ground LanceSoft advances here: that "such solicitations are not telemarketing (or advertising) within the scope of the TCPA." *Id.* at *1, *3. The court denied the motion.

The *Risher* court held that because Adecco "is not to be the employer" but "is offering to assist recipients of its texts to find jobs," the texts "may be reasonably characterized as soliciting the recipients to utilize Adecco's services." *Id.* at *4. Adecco's insistence that "job applicants do not pay for its services - the employers do" did not change the result. *Id.* at *4 n.4. The "fact that prospective employees may not directly pay for those services does not preclude application of the statute," because "a result that turned on which party actually writes the check to Adecco would elevate form over substance." *Id.* at *4 and n.4.

LanceSoft also relies on *Hulce v. Zipongo Inc.*, 132 F.4th 493 (7th Cir. 2025), a case that is actually "useful" for Plaintiff's position. (Doc. 17, p. 10) (citing *Hulce* and calling the case "useful" for Defendant's position).

*Hulce* was decided on summary judgment, after discovery established that the defendant's nutrition services were provided "at no cost" to plan members, who "would not pay any fee, copay, or coinsurance." *Hulce*, 132 F.4th at 496. On that record, the defendant's "purpose could not have been to encourage Hulce to pay for services that **<u>were free to him</u>**." *Id.* at 500 (emphasis added). The court was careful to limit its holding: "Do not overread our decision to create a sweeping loophole within the prohibition of telephone solicitations." *Id.* Rather, the court noted that the plaintiff had failed "on a unique set of facts, involving calls and messages . . . **<u>about entirely free services</u>** available through his state and Medicaid funded healthcare plan." *Id.* at 500-01 (emphasis added).

The rule *Hulce* announced on the facts before it is that a telephone solicitation is a call initiated "for the purpose of persuading or urging someone to pay for a service," and that the person encouraged must be "the party who makes the purchasing decision." *Id.* at 499-500. The Complaint satisfies that rule. The person LanceSoft called and encouraged (Plaintiff) is the person who would decide whether to accept LanceSoft's placement, and the Complaint alleges that a candidate who does so pays for LanceSoft's services out of her own hourly earnings, in an amount fixed by LanceSoft's markup, for as long as she works. (Complaint, ¶¶ 22, 25, 30-34). LanceSoft's services were not "free to" Plaintiff; they carried a price. For example, under one of LanceSoft's contracts, a markup of up to 31% on the worker's wages. *Id.* at ¶ 26. LanceSoft's gloss that "*Hulce* thus shows . . . use of a service is not a purchase" drops the word that did all the work in *Hulce*: **free.** (Doc. 17, p. 11).

LanceSoft's remaining cases share a common feature that is absent here: each involved a caller recruiting the recipient to work for the caller itself, and none involved a fee inherent in the engagement and borne by the recipient.

*Andersen* involved a mortgage company recruiting loan officers to work for it and the court stressed that the only fee at issue was one the recruit "could pass . . . along to potential customers." *Andersen v. Nexa Mortg., LLC*, 2024 WL 3762098, at *1, 3 (C.D. Cal. Aug. 12, 2024). Unlike *Andersen*, the fee here runs the other direction: it comes out of the candidate's pay. *Friedman v. Torchmark Corp.*, 2013 WL 4102201 (S.D. Cal. Aug. 13, 2013), involved an insurer recruiting independent contractors to sell its own policies and the only alleged purchase was access to a customer base available after completing a free

webinar - a chain which the court found too remote. *Id.* at *1, 5-6. Here, payment is not optional or remote, it is directly built into every hour worked. *Payton v. Kale Realty, LLC*, 164 F.Supp.3d 1050 (N.D. Ill. 2016), was decided on a summary judgment record, and concerned a brokerage recruiting agents for itself. *Id.* at 1061-63. *Lutz Appellate Servs., Inc. v. Curry*, 859 F. Supp. 180, 181 (E.D. Pa. 1994), held only that a competitor's faxed "help wanted" ad for "job opportunities within its ranks" was not an "unsolicited advertisement" of "the commercial availability of property." *Reardon v. Uber Technologies, Inc.*, 115 F.Supp.3d 1090, 1092, 1096-97 (N.D. Cal. 2015), likewise involved a company recruiting drivers for its own platform. Last, *Gerrard v. Acara Solutions, Inc.*, 469 F.Supp.3d 96 (W.D.N.Y. 2020), as *Rockwell* observed, involved messages that "may suggest that the relevant position was with the defendant." 2025 WL 959745, at *4, n.6.

In short, none of these cases involved what Plaintiff pleads here: a for-profit middleman whose product is the placement, whose compensation is carved from the placed worker's wages, and whose own contracts pay it nearly double when its cold calls are the source of the candidate.

**a. LanceSoft's "contradiction" argument is a factual dispute which does not support dismissal at this stage.**

LanceSoft further contends that Plaintiff's allegations are "contradicted by the FAC itself," because the Complaint alleges that LanceSoft is paid by its clients. (Doc. 17, p. 9.) There is no contradiction. The Complaint alleges that LanceSoft is paid by its clients and that the payment comes out of the candidate's earnings. (Complaint, ¶¶ 22, 25, 30-34). Both things are true of every intermediary who is compensated from the proceeds of a

transaction he or she brokers - whether that is the real estate broker, the talent agent, or the contingency-fee lawyer. That the check is written by a third party does not mean the worker is not paying. LanceSoft simply disagrees about who bears the economic cost of its markup. That is a factual dispute about the workings of its own business, on which it may later offer evidence. It is not a basis for dismissal under Rule 12(b)(6).

LanceSoft further protests that, on Plaintiff's theory, its pitch would be for candidates "to earn less for being placed in employment by LanceSoft," which is "hardly an 'encouragement.'" (Doc. 17, p. 10 n.3.) That, however, describes every commission-based service. The pitch is a job the candidate would not otherwise have, at a price (the markup) LanceSoft does not advertise. Whether that is a good bargain is beside the point - the TCPA asks whether LanceSoft called to encourage it. Moreover, LanceSoft's assertion that "[h]ow LanceSoft's clients allocate their resources . . . has nothing to do with LanceSoft's motivations in calling" is an assertion about LanceSoft's motivations. (Doc. 17, p. 10). A party's motivation is a quintessential fact question.

**3. The communications are also "telephone solicitations" under the NCTSA.**

The communications at issue are also actionable under the NCTSA, which defines "telephone solicitation" more broadly than the TCPA. Beyond communications encouraging "the purchase or rental of, or investment in, property, goods, or services," the statute independently covers communications made "for the purpose of . . . obtaining or providing information that will or may be used for that purpose." N.C. GEN. STAT. § 75-101(9). The Complaint expressly invokes this clause. (Complaint, ¶ 111). Specifically, the

Complaint alleges that on its calls LanceSoft repeatedly "asked for [Plaintiff's] resume," and that a resume is "precisely the information Defendant uses to submit candidates to its clients and thereby earn placement fees." *Id.* at ¶¶ 56-57; *see also* ¶ 111. Soliciting a consumer's resume is an example of "obtaining . . . information that will or may be used" to sell staffing services. LanceSoft acknowledges it "encouraged its clients . . . to purchase services LanceSoft provided to its clients." (Doc. 17, p. 9). The resume is the basis of that sale.

Instead of considering the plain language of the NCTSA and its differences from the TCPA, Defendant simply asserts that "[t]he NCTSA definition is almost identical to the TCPA's" and that the claims fail "for the same reasons." (Doc. 17, pp. 11-12.) That is incorrect as to the "obtaining information" prong, and that omission independently defeats dismissal of the North Carolina counts.[2]

LanceSoft's sole NCTSA authority is *Davis*, which it cites for the basic assertion that the NCTSA is "almost identical" to the TCPA. (Doc. 17, p. 12.) LanceSoft does not mention the result. *Davis* rejected the same "conclusory" solicitation argument LanceSoft presses here. Specifically, *Davis* denied the motion to dismiss, holding that "from the context, it is clear that the message was meant to elicit a business transaction between the recipient and" the defendant, and that the plaintiff's "allegations are sufficient to show solicitation." *Davis*, 2023 WL 1982354, at *4. The same is true here. LanceSoft's own

---

[2] Moreover, the NCTSA defines both "telephone solicitation" and "unsolicited telephone call" to include a "voice **or text** communication." N.C. GEN. STAT. § 75-101(9), (12). Again, Plaintiff's text message claims are not abandoned as to the NCTSA counts.

paraphrase of the test - whether the communication "was meant to elicit a business transaction involving the recipient and the caller" describes precisely what the Complaint asserts. (Doc. 17, p. 12). Had Plaintiff accepted LanceSoft's solicitations, she would have entered a transaction with LanceSoft, which would have paid her "on W2," and LanceSoft would be paid from the markup on Plaintiff's wages. (Complaint, ¶¶ 22, 25, 31-34, 39-40).

**B. The Court should deny Defendant's Motion to Strike because Defendant does not establish it would be impossible to certify and because Plaintiff's class definitions are not "fail-safe."**

**1. Defendant fails to establish that it is "impossible" for Plaintiff to certify a class**

LanceSoft concedes that "early striking is an exceptional remedy." (Doc. 17, p. 13.) It is. Rule 12(f) motions to strike class allegations are "infrequently" granted in the rare instance where the "face of" the complaint establishes it "will be impossible to certify the classes alleged by the plaintiffs regardless of the facts the plaintiffs may be able to prove." *Schwab*, 2026 WL 673105, at *6 (internal citation and quotation omitted).

LanceSoft asks for this relief before it has answered and before discovery has occurred. Indeed, every appellate decision LanceSoft cites (*EQT Prod. Co.*, *Career Counseling*, *Randleman*, *Messner*, *Cordoba*, *Gene & Gene*, and *Dukes*) arose from class certification rulings made on an evidentiary record. (Doc. 17, pp. 13-16). Not one of these cases struck class allegations from a complaint. LanceSoft's lone pleading-stage authority is an out-of-circuit district court decision. (*Id.* at p. 13 (citing *Zarichny v. Complete Payment Recovery Servs., Inc.*, 80 F.Supp.3d 610 (E.D. Pa. 2015))). By contrast, in *Risher*, the court denied a staffing agency's request to strike class allegations as "premature, as it

is based on arguments more appropriately considered at the class certification stage." *Risher,* 2020 WL 13505422, at *4 n.5.

More fundamentally, LanceSoft overlooks that the Fourth Circuit has affirmed a Do-Not-Call class judgment for a class defined the same way. The class in *Krakauer v. Dish Network, L.L.C.* consisted of persons "whose telephone numbers were listed on the federal Do Not Call registry for at least 30 days, but who received **telemarketing calls**" promoting the defendant's services. *Krakauer*, 925 F.3d 643, 654 (4th Cir. 2019) (emphasis added). Far from condemning that definition, the *Krakauer* court held that "[t]he private right of action in § 227(c)(5) offers many advantages for class-wide adjudication," and that, "[g]iven the remedial purpose of the TCPA, it is no surprise that its cause of action would be conducive to class-wide disposition." *Id.* at 655-56.[3]

### 2. The current class definitions are not fail-safe.

A fail-safe class is one "defined so that whether a person qualifies as a member depends on whether the person has a valid claim." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 360 n.9 (4th Cir. 2014) (quotation omitted). The Fourth Circuit has "not expressly recognized an independent prohibition against fail-safe classes." *Mr. Dee's Inc. v. Inmar, Inc.*, 127 F.4th 925, 931 (4th Cir. 2025). In any event, Plaintiff's classes are not fail-safe. Courts routinely reject the argument that a Do-Not-Call class defined by receipt of "telemarketing" calls is fail-safe. In *Costa v. Dvinci Energy, Inc.*, 342 F.R.D. 38 (D. Mass.

---

[3] Courts often certify Do-Not-Call classes defined in these terms. *See Vance v. DirecTV, LLC*, 2022 WL 3044653 (N.D. W. Va. Aug. 1, 2022); *Mantha v. QuoteWizard.com, LLC*, 347 F.R.D. 376 (D. Mass. 2024); *Williams v. Pisa Grp., Inc.*, 2023 WL 2227697 (E.D. Pa. Feb. 24, 2023).

2022), the court declined to strike a class of persons whose numbers "were on the National Do Not Call Registry for at least 31 days, but who received more than one telemarketing call[] from or on behalf of Defendant within a 12-month period." *Id.* at 39. The court was "unpersuaded that the class is fail-safe," because "a person's membership can be determined without reaching any legal conclusions about [defendant's] liability"; the class "could encompass people to whom [defendant] would not be liable, such as those who had given [defendant] prior written consent." *Id.* at 40.

The same is true here. Whether a call was one of LanceSoft's recruiting calls, placed under the uniform business model the Complaint describes, is a question of fact answerable from LanceSoft's own records, not a legal conclusion about liability. And the classes include persons against whom LanceSoft may have defenses: the internal do-not-call classes include persons who later consented, and the DNC List classes include persons whose numbers were registered by someone else or used for business. Membership does not depend on LanceSoft losing.

Even where the fail-safe concern is recognized, LanceSoft's own authority holds that it "can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012). Furthermore, Rule 23(c)(1)(C) exists for that purpose as the court may "alter or amend" an "order that grants or denies class certification" at any time before "final judgment." FED. R. CIV. P. 23(c)(1)(C).

Finally, LanceSoft argues that if its recruiting calls "are not telephone solicitations or telemarketing, the proposed classes contain no members." (Doc. 17, p. 14.) That is

another way of saying that the central liability question - whether LanceSoft's uniform recruiting calls, made pursuant to a uniform business model, are telephone solicitations - will be answered once, for everyone, "in one stroke." *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). That is the hallmark of commonality under Rule 23. Nothing about that question turns on "message-by-message and person-by-person review." (Doc. 17, p. 16). It turns on how LanceSoft is paid and why it calls, which are the same questions to be answered for every class member.

The remaining "individualized" issues LanceSoft lists - whether a number was on the Registry for thirty days, whether it is residential, when a stop request was made - are the same issues *Krakauer* found manageable with class-wide data. There, "[c]lass members could . . . be identified on a large-scale basis," and the court "was presented with data showing whether a number was residential and connecting the number to particular names and addresses." *Krakauer,* 925 F.3d at 658. Whether comparable data exists here is a question for discovery, not for speculation in a Rule 12 brief. Indeed, LanceSoft suggests the existence of such records by acknowledging its records "may show that a number was contacted, when the contact occurred, and perhaps which campaign or sender was used." (Doc. 17, p. 15.)

## V. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's Motion to Dismiss and to Strike Class Allegations. Alternatively, any

dismissal or striking of class allegations should be without prejudice and with leave to amend.[4]

Respectfully submitted,


**MAGINNIS HOWARD**

*/s/ Karl S. Gwaltney*
Karl S. Gwaltney
N.C. State Bar No. 45118
7706 Six Forks Road, Suite 101
Raleigh, North Carolina 27615
Tel: 919-526-0450 | Fax: 919-882-8763
kgwaltney@carolinalaw.com

**BUTSCH ROBERTS & ASSOCIATES LLC**

*/s/ Christopher E. Roberts*
Christopher E. Roberts
(admitted by special appearance)
Mo. Bar No. 61895
7777 Bonhomme Avenue, Suite 1300
Clayton, Missouri 63105
Tel: (314) 863-5700
croberts@butschroberts.com

Counsel for Plaintiff


## CERTIFICATE OF WORD COUNT

Pursuant to M.D.N.C. Local Rule 7.3(d), the undersigned certifies that this brief, exclusive of the caption, signature blocks, and certificates, does not exceed 6,250 words as measured by the word-count function of the word-processing software used to prepare it. The brief contains 6,248 words.

*/s/ Christopher E. Roberts*
Christopher E. Roberts

[4] Even the authority relied on by LanceSoft permits this result. *Rockwell* permitted leave to amend after dismissing the complaint without prejudice. *Rockwell*, 2025 WL 959745, at *5.

## CERTIFICATE OF SERVICE

I hereby certify that on October 7, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Christopher E. Roberts*
Christopher E. Roberts